2021 IL App (2d) 200613-U
No. 2-20-0613
Order filed September 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re MARRIAGE OF<br>TRESSA M. LANGHANS, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 20-OP-406 |
| | ) | |
| RONALD LEE LANGHANS, JR., | ) | Honorable |
| | ) | Michael W. Fleming, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hudson and Birkett concurred in the judgment.

**ORDER**

¶ 1 *Held*: We affirm the trial court's order of protection.

¶ 2 Respondent, Ronald Lee Langhans, Jr., appeals an order of protection against him as to petitioner, Tressa M. Langhans, and their three minor children. Ronald essentially raises three arguments: (1) the trial court failed to comply with section 8-2601 of the Code of Civil Procedure (Code) (735 ILCS 5/8-2601 (West 2020) (concerning the admission of out-of-court statements by a child under age 13 concerning any act of child abuse)); (2) the trial court failed to comply with section 214(c)(3) of the Illinois Domestic Violence Act (Act) (750 ILCS 60/214(c)(3) (West 2020)

(requiring the trial court to make certain express findings)); and (3) the trial court's entry of the plenary order of protection was against the manifest weight of the evidence because (a) there were insufficient grounds to enter the firearms restriction pursuant to section 214(b)(14.5)(a) of the Act (750 ILCS 60/214(b)(14.5)(a) (West 2020)) and (b) the trial court did not comply with section 214(c) of the Act (750 ILCS 60/214(c)(2) (West 2020) (requiring the trial court to compare relative hardships in awarding possession of the family home)). Ronald also argues that the trial court erred in denying his motion to reconsider based on many of these same arguments. For the reasons that follow, we reject Ronald's arguments and affirm.

¶ 3                                    I. BACKGROUND

¶ 4      At the time relevant to this case, Ronald and Tressa were engaged in divorce proceedings. They had three minor children, ages two, five, and nine. On May 4, 2020, Tressa filed for an order of protection against Ronald. The petition alleged that Ronald committed acts of verbal abuse and property damage and that this created a fearful home environment. Specifically, Tressa wrote: "I filed the order of protection because our kids locked themselves in a bedroom screaming in fear that he was going to get [them]." She also reported that one of their children stated: "I don't want to be alone with Deeda he is so scary." The trial court granted an emergency order of protection. The transcripts from the emergency hearing are not in the record, nor is there a bystanders' report.

¶ 5      On May 19, 2020, the trial court conducted the plenary hearing. Tressa and Ronald, each appearing *pro se*, testified. Tressa testified that she did not believe that matters had genuinely improved since the entrance of the emergency order. Ronald was trying to be "nicer," but he continued to blame Tressa for their circumstances. Primarily, she worried about the "mental and emotional" issues. For example, Ronald went through Tressa's phone. He told her that he did not trust her anymore and, to regain her trust, she must hand over her phone. He stated that when she

paid the phone bill, he would stop going through her phone. Ronald also called her "really bad names" in front of the kids. He thought she was cheating on him, but she was not. To Tressa, he would say: "I'm done with you. You can tell him to have you." In front of the children, he would say: "I'm done with you. Get out of here."

¶ 6 The trial court asked Tressa whether there had ever been any physical abuse. Tressa answered:

> "Not [toward] me, but throwing, breaking, slamming, very loud slamming. Doesn't matter what time it is. It could be 2:00 in the morning ***. He has not hit anybody, but he does throw his physical anger around."

Also, Ronald damaged property. He broke beer bottles on the floor. He punched a vehicle because he was mad at Tressa.

¶ 7 Tressa testified that Ronald showed no "concern as to who sees or hears the mistreatment." For example, one day, they went to Delnor Hospital for their two-year-old's orthopedic appointment. In the drop-off area, in front of other people, he screamed at her "so loud[ly], he got out of the car, he slammed the door, he continued to scream at me in front of the people leaving the hospital." She told him that a bystander was going to "call the cops," and he replied: "I don't give a s**t. Don't make me angry."

¶ 8 Tressa testified to the effect of Ronald's behavior on the children. Her older son is experiencing distress. "He can't sleep at night. He's scared that people are coming to get him." His teacher contacted her because he told the teacher that he was "really stressed out." He did not complete his assignments. Also, two of the children have told different neighbors that "their dad yells at their mom so bad that she cries, and they don't want to be at home."

¶ 9 Tressa concluded that Ronald's anger has been "progressing" for the last 18 months. "I'm

worried [because] each time that things have happened, it has been a little bit louder and a little bit worse. *** And I just don't want to see if there is a next time, because I don't want think we should have to deal with that." She also stated: "He needs to seek help ***. Otherwise, it's just not safe in our house with him."

¶ 10 Ronald testified that "there is a lot of truth to some of the things that [Tressa] is saying." Ronald admitted that he yelled: "We were arguing late into the night. And yes, I did allow myself to shout or scream, and I should not have done that." He also admitted that he committed property damage:

> "As far as breaking things, I broke a beer bottle on the garage floor; [a] picture frame ***; and I believe something else.
>
> That's what I've broken. Yes, I did punch an older car, hers, and put a little dent in it. That was probably six, seven years ago."

Ronald further agreed that the arguments caused the children to feel unsafe. Without being directly questioned on the matter, he chose to explain the allegation in the petition that the children had locked themselves in their bedrooms. He explained:

> "This instance, I was leaving for work. In our basement, we have a back room where I keep my firearms and some tools. *** I went into this room to grab a tool.
>
> Now, I cannot recall if we had been fighting that day, or you know, if the tensions were high in the house that day. But somewhere in that, my kids thought that I had a knife, and I was going to hurt myself.
>
> Tressa called me when I got to work trying to explain the situation and what had happened. And I said no, absolutely not. I didn't bring anything out of the basement to hurt myself or anyone else. I talked to the children on the phone. Kind of calmed them

down immediately after that.

The very next day, I had a conversation with all three kids, and I literally watched the tension, well, not so much the two year old, but the five year old and the nine year old, I watched the tension melt out of their bod[ies] as I explained to them I would never in a million years do anything to hurt you or your brothers or your mother or myself. Never. And I watched that tension leave my children."

¶ 11    Ronald testified that Tressa shared some of the blame. He and Tressa had "both said a lot of nasty things to each other." Also, in one instance, Ronald yelled because he was hurt by one of the children's toys. Instead of sympathy, he "got met with attitude" from Tressa. In Ronald's view, the children may have been "frightened by their mother and father yelling at each other," but the children were not necessarily afraid of *him* in particular.

¶ 12    In its oral ruling, the trial court stated that "there is not really a credibility issue here," because Ronald "basically corroborated some of the more relevant issues." Those issues included verbal abuse and property damage. Ronald has also "acknowledged that [the] kids do have tension regarding what they have witnessed." The court concluded that Ronald's behavior "constituted harassment based upon the verbal abuse and the property damage, which could cause some tension with both your wife and kids. I do find that the activity did cause the petitioner distress. Based upon that, I'm going to grant the plenary order."

¶ 13    The court then inquired as to the parties' income and expenses. Ronald informed the court that he "provides the income," not Tressa. He netted $1200 per week, or $5200 per month, working as a mechanic for UPS. He "might" be able to find a motel for $500 to $1000 per week. The mortgage on the family home was $1500 per month. The family car needed repairs. The court awarded possession of the marital home to Tressa. (The trial court also entered a child

support order which was later vacated in cooperation with the divorce court.)

¶ 14 As a final matter, the clerk reminded the trial court about the firearms restriction. (The clerk's reminder was recorded in the transcripts as "indiscernible," though the word "firearms" was recorded.) The court then instructed Ronald as to the practicalities of surrendering his firearms (which Ronald had already done in conjunction with the emergency order) and FOID card (which Ronald had not yet done).

¶ 15 The written order, which was comprised of checked boxes and filled-in blanks on a form, provided that the order of protection was for a term of two years, expiring on May 17, 2022. The order further provided that Ronald was prohibited from committing further acts or threats of abuse, specifically, harassment and intimidation of a dependent. Ronald was to stay 1000 feet away from the family home. Visitation of the children was "restricted," because Ronald was likely to use visitation as an opportunity to harass Tressa and act in a manner that would not be in the best interest of the children. Thus, visitation would be "as agreed upon by the parties." Also: "[Ronald] may contact [Tressa] by text message to arrange visitation that is agreeable by both parties. This contact shall not be harassing or abusive in nature. [Ronald] will remain in his vehicle during pick up and drop off of the children at [Tressa's] residence."

¶ 16 Relevant to this appeal, the court also checked box 1 in the firearms section, which provided:

> "1. (R14.5) (Police Enforced) The Court has examined the Petitioner and any other witnesses under oath, has examined the petition and other relevant evidence on the issue of whether Respondent has threatened or is likely to use a firearm(s) illegally against Petitioner and finds that there is a danger of the illegal use of firearms."

¶ 17 On June 18, 2020, Ronald, now represented by counsel, moved to reconsider pursuant to

section 2-1203 of the Code. 735 ILCS 5/2-1203 (West 2020). Ronald raised similar arguments to those on appeal, except that he did not argue, as he does on appeal, that the trial court failed to balance the relative hardships in awarding possession of the family home. In any event, at the hearing, Ronald focused on his argument that the trial court failed to comply with section 8-2601 of the Code:

> "I do believe that what is required under [*Arika M. v. Christopher M.*, 2019 IL App (4th) 190125] [is] that your Honor have a hearing and make specific findings pursuant to [section 8-2601] as to why anything that the children felt, said[,] or saw was allowed into evidence though either parties' testimony. Without [a] specific hearing under the [C]ode, I believe that this is a reversible error."

¶ 18 The trial court rejected Ronald's argument. It explained:

> "I'm going to specifically say I didn't rely on any hearsay testimony regarding the school counselor ***. It was more [Tressa's] testimony and [Ronald's] testimony regarding the incidents of verbal abuse and property damage, which I found both of those cumulatively to be the bases for the harassment, which is the basis for the granting of the plenary."

It further explained: "[W]hat I based my ruling on was the observations of the parties and the actions of the parties, not the [out-of-court statements] of the children."

¶ 19 This appeal followed.

¶ 20                                    II. ANALYSIS

¶ 21 Ronald raises three arguments on appeal: (1) the trial court failed to comply with section 8-2601 of the Code (concerning the admission of out-of-court statements by a child under age 13 concerning any act of child abuse); (2) the trial court failed to comply with section 214(c)(3) of

the Act (requiring the trial court to make certain express findings); and (3) the trial court's entry

of the plenary order of protection was against the manifest weight of the evidence because (a) there

were insufficient grounds to enter the firearms restriction pursuant to section 214(b)(14.5)(a) of

the Act and (b) the trial court did not comply with section 214(c) of the Act (requiring the trial

court to compare relative hardships in awarding possession of the family home). Ronald also

argues that the trial court erred in denying his motion to reconsider based on many of these same

arguments. Tressa has not filed a response brief. However, the straightforward nature of the record

and claimed errors are such that we may decide the merits of the appeal. See *First Capitol*

*Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 22                                A. Section 8-2601

¶ 23     We first address Ronald's section 8-2601 argument, which he raised for the first time in

his motion to reconsider. Generally, a trial court's rulings on evidentiary matters will not be

reversed absent a clear abuse of discretion. *In re T.T.*, 384 Ill. App. 3d 147, 155 (2008). The

instant case calls for us to review the trial court's handling of the evidence in light of Ronald's

failure to object, and we review the trial court's conduct in this instance for an abuse of discretion.

A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or when

no reasonable person would adopt the court's view. *Enbridge Pipelines (Illinois), LLC v. Troyer*,

2015 IL App (4th) 150334, ¶ 14.

¶ 24     Section 8-2601 of the Code, which is the civil counterpart to section 115-10 of the Code of

Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2020)), applies in order of protection

proceedings. *Arika M.*, 2019 IL App (4th) 190125, ¶ 23; *In re Marriage of Flannery*, 328 Ill. App.

3d 602, 606-08 (2002) (Second District); *cf. In re Marriage of Gilbert*, 355 Ill. App 3d 104, 112

(2004) (First District) (declining to apply section 8-2601 and instead applying the admission

guidelines set forth in section 606.5(c) of the Marriage and Dissolution of Marriage Act (750 ILCS 5/606.5(c) (West 2020) (formerly 606(e) of the Dissolution Act)) after reasoning that the order of protection implicated the parties' custody arrangement). Section 8-2601 provides that the following two requirements must be met to admit an out-of-court statement of a child under age 13 involving "any act of child abuse": (1) the court *conducts a hearing* outside the presence of the jury and finds that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and (2) the child either: (i) testifies at the proceeding; or (ii) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement. (Emphasis added.) 735 ILCS 5/8-2601 (West 2020). Here, Ronald contends that neither requirement was met and he requests that, at a minimum, we remand the case for the trial court to conduct a reliability hearing.

¶ 25    In this case, the only out-of-court statements concerning "any *act* of child abuse" are the children's statements to teachers and neighbors that their father yells at their mother in front of them. The remaining statements concern the children's emotional *reactions* for having witnessed their father yelling at their mother. Ronald did not object to the admission of any of these statements. Rather, he largely corroborated them. Ronald unequivocally admitted that he yelled at Tressa and damaged property. He also admitted that, in doing so, he caused the children to feel unsafe. In his own words, when Ronald assured the children that his angry words would never lead to physical harm, he "watched the tension melt out of their bod[ies]."

¶ 26    Generally, the failure to object to hearsay forfeits the issue on appeal. *People v. Ramsey*, 205 Ill. 2d 287, 293 (2002). Moreover, when hearsay evidence is admitted without an objection, it is to be considered and given its natural and probative effect. *Jackson v. Board of Review of*

*Department of Labor*, 105 Ill. 2d 501, 508 (1985); *In re Marriage of Deckard*, 246 Ill. App. 3d 427, 432 (1993). We determine that these principles control the instant case.

¶ 27　　We do acknowledge that forfeiture is a limitation on the parties, not the courts. *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 22. The court may overlook forfeiture and address the merits when necessary to maintain a sound and uniform body of precedent or achieve a just result. *Id*. Here, however, relaxing the rule of forfeiture is not necessary to achieve a uniform body of precedent or a just result.

¶ 28　　Unlike the parties in any published order-of-protection/section 8-2601 case that we have found, Ronald did not put the question of admissibility squarely before the court at the time of the hearing. See *Arika*, 2019 IL App (4th) 190125, ¶ 8 (the respondent objected to the hearsay evidence); *Trinidad C. v. Augustin L.*, 2017 IL App (1st) 171148, ¶ 14 (the petitioner moved *in limine* to admit the hearsay evidence); *Flannery*, 328 Ill. App. 3d at 604 (the respondent moved to strike the hearsay statements at the close of petitioner's case). Instead, the trial court here was left to explain the admissibility of the statements in a subsequent motion to reconsider.

¶ 29　　To this end, the trial court expressly stated at the hearing on Ronald's motion to reconsider that it did not rely on the children's out-of-court statements in issuing the order of protection. It stated: "I'm going to specifically say I didn't rely on any hearsay testimony regarding the school counselor." It also stated: "[W]hat I based my ruling on was the observations of the parties and the actions of the parties, not the [out-of-court statements] of the children." Thus, to the extent the children's statements could be considered section 8-2601 hearsay, the trial court expressly stated that it did not rely upon those statements. It considered the natural probative effect of the statements to be minimal. Because of this, and because Ronald *agreed* that he yelled at Tressa and that this caused the children to feel unsafe, we decline to remand this case for the trial court to

conduct a reliability hearing to determine the admissibility of the statements. The trial court did not abuse its discretion in its handling of the matter.

¶ 30                                B. Section 214(c)(3) of the Domestic Violence Act

¶ 31     We next address Ronald's general argument that the trial court did not make adequate section 214(c)(3) findings sufficient for this court's review of the order of protection. Ronald argues that the instant case is analogous to *Landman v. Landman*, 2019 IL App (5th) 180137, ¶ 19, which reversed the trial court's order of protection based on its failure to make section 214(c)(3) findings. We disagree and determine that the trial court met the statutory standards set forth in section 214(c)(3) of the Act. Whether the trial court complied with section 214(c)(3) presents a question of law, which we review *de novo*. *People v. Cuevas*, 371 Ill. App. 3d 192, 195-96 (2007).

¶ 32     Section 214(c)(3) provides:

"[T]he court shall make its findings in an official record or in writing, and shall at a minimum set forth the following:

(i) That the court has considered the applicable relevant factors described in paragraphs (1) [concerning the nature, frequency, severity, pattern and consequences of the respondent's past abuse] and (2) [concerning comparing relative hardships resulting to the parties from loss of possession of the family home] of this subsection.

(ii) Whether the conduct or actions of respondent, unless prohibited, will likely cause irreparable harm or continued abuse.

(iii) Whether it is necessary to grant the requested relief in order to protect petitioner or other alleged abused persons." 750 ILCS 60/214(c)(3) (West 2020).

¶ 33    In *Landmann*, the respondent argued that the trial court made no findings pursuant to section 214(c)(3)(i). The appellate court agreed, and it explained: "[Neither] the trial court's oral pronouncement that it 'heard the evidence [and] considered the credibility of the witnesses,' nor its written [form] order stating that it had reviewed the petition and heard the evidence, satisfie[d] the statute's requirement[s] ***." *Landmann*, 2019 IL App (5th) 180137, ¶18.

¶ 34    Here, in contrast, the trial court made the requisite findings, either in its written order or at the hearing, as to subsections (3)(i), (ii), and (iii). As to subsection (3)(i), the language on page four of the trial court's order tracked the language of paragraph 1, concerning the nature, frequency, severity, pattern, and consequences of the respondent's past abuse. The transcripts from the proceedings, in turn, record the trial court's thought-process and findings as to paragraph 2, concerning the family home (which we will discuss further in the next section). As to subsection (3)(ii) and (3)(iii), the language on page four of the trial court's order again tracked the language of the statute.

¶ 35    In addition to this form language, the trial court made specific findings in its oral pronouncement which were tailored to the facts of the case. For example, the trial court stated that Ronald's behavior "constituted harassment based upon the verbal abuse and the property damage, which could cause some tension with both your wife and kids. I do find that the activity did cause the petitioner distress. Based upon that, I'm going to grant the plenary order ***." The trial court provided far more detailed findings than the trial court in *Landmann*, which stated only that it heard the evidence and considered the credibility of the witnesses. We reject Ronald's section 214(c)(3) argument.

¶ 36        C. The Order of Protection is Supported by the Evidence

¶ 37　We next address Ronald's argument that the entry of the plenary order of protection was against the manifest weight of the evidence and, more specifically, that there were insufficient grounds to enter the firearms restriction pursuant to section 214(b)(14.5)(a) of the Act and that there was "no evidence" to show that the trial court balanced the hardships in awarding the family home to Tressa pursuant to section 214(c)(2) of the Act. A finding is against the manifest weight of the evidence when the opposite conclusion is clearly apparent or where the findings of the jury are unreasonable, arbitrary, and not based on the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992).

¶ 38　Ronald raised the section 214(b)(14.5)(a) argument only transiently in his written motion to reconsider. He did not raise the section 214(c)(2) argument at all. Nevertheless, "in a non-jury civil case, the failure to include a point in a post-trial motion does not preclude its being raised on appeal." (Internal quotation marks omitted.) *Malfeo v. Larson*, 208 Ill. App. 3d 418, 422 (1990); see also *Arient v. Shaik*, 2015 IL App (1st) 133969, ¶ 26 (comparing the requirements for posttrial motions in jury trials versus bench trials). We therefore address Ronald's arguments.

¶ 39　Section 214(b)(14.5)(a) of the Act provides:

　　"(b) *** The remedies listed in this subsection shall be in addition to other civil or criminal remedies available to petitioner.

　　　　　　　　* * *

　　(14.5) Prohibition of firearm possession.

　　　　(a) Prohibit a respondent against whom an order of protection was issued from possessing any firearms during the duration of the order if the order:

(1) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(2) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(3)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury." 750 ILCS 60/214(b)(14.5)(a) (West 2020).

¶ 40    Ronald appears to concede that subsections (1) and (2) have been satisfied. Indeed, the order was issued following a hearing of which Ronald had notice and in which he participated. Also, the order restrained Ronald from harassing Tressa and the children.

¶ 41    Ronald's argument focuses on subsection (3)(i). Ronald contends that the trial court did not determine, nor did the evidence support, that he "represent[ed] a credible threat to the physical safety of [Tressa and the children]." 750 ILCS 60/214(b)(14.5)(a)(3)(i) (West 2020). He notes that Tressa testified that there had been no "physical abuse" toward any protected party, only verbal or emotional abuse and property damage. We reject Ronald's argument for two reasons.

¶ 42    First, the parties' colloquial use of the term physical abuse is not the same as the statutory definition of physical abuse.  Section 103(14) of the Act provides that physical abuse includes "knowing or reckless use of physical force ***" and "knowing or reckless conduct which creates an immediate risk of physical harm."  750 ILCS 60/103(14)(i), (iii) (West 2020).  Here, Tressa testified that, although Ronald "has not hit anybody," he does "throw his physical anger around."  There has been "throwing, breaking, slamming, very loud slamming."  Ronald threw beer bottles on the floor.  During one fight, Ronald slammed a car door in anger while at the hospital drop-off area with the parties' two-year-old child.  Ronald did not "give a s**t" whether the bystanders called the police.  A trier of fact would be free to determine that this conduct demonstrated a "reckless use of physical force."

¶ 43    Second, the trial court *did* find that Ronald represented a credible threat to the physical safety of Tressa and the children.  Although the language of the court's order does not track the language of the statute exactly, the court's order provided: "The Court has examined the Petitioner and any other witnesses under oath, has examined the petition and other relevant evidence on the issue of whether Respondent has threatened or is likely to use a firearm(s) illegally against Petitioner and finds that there is a danger of the illegal use of firearms."  In our view, the "danger of the illegal use of firearms" presents a credible threat to the physical safety of Tressa and the children.

¶ 44    Moreover, the evidence supports the trial court's finding.  Tressa alleged that, following a fight between herself and Ronald, the children locked themselves in their rooms in fear of Ronald.  Ronald chose to elaborate on the details of that incident.  He informed the court:

"In our basement, we have a back room where I keep my firearms and some tools. *** I went into this room to grab a tool.  Now, I cannot recall if we had been fighting that

day, or you know, if the tensions were high in the house that day. But somewhere in that, my kids thought that I had a knife, and I was going to hurt myself."

Ronald further admitted that the children were very upset and that he had to call them on the phone from work to explain to them that he would never do anything to hurt anyone in the family. This, along with evidence of verbal abuse and property damage which, according to Tressa, is accelerating, substantiates the court's finding.

¶ 45    Ronald also complains that there was "no evidence" to demonstrate that the trial court balanced the hardships in awarding Tressa possession of the family home pursuant to section 214(c)(2). We disagree.

¶ 46    Section 214(c) provides:

"In comparing relative hardships resulting to the parties from loss of possession of the family home, the court shall consider relevant factors, including but not limited to the following: (i) availability, accessibility, cost, safety, adequacy, location and other characteristics of alternate housing for each party and any minor child or dependent adult in the party's care; (ii) the effect on the party's employment; and (iii) the effect on the relationship of the party, and any minor child or dependent adult in the party's care, to family, school, church and community." 750 ILCS 60/214(c)(2) (West 2020).

¶ 47    Here, at the close of the hearing, the trial court specifically asked Ronald questions about his income and expenses. Ronald testified that he netted $1200 per week, or approximately $5200 per month working for UPS. He further testified that he would be able to live in a motel for $500 to $1000 per week. Ronald informed the court that he was the family breadwinner, and it was clear from the evidence that Tressa was the primary caregiver. The children would continue to live with Tressa. Separate housing for an adult and three children would undoubtably be more

expensive than housing for a single adult. The court also considered the parties' mortgage and expenses such as car repairs. As such, we cannot say that there was no evidence to demonstrate that the trial court balanced the hardships in awarding Tressa possession of the family home. Ronald has not demonstrated that the trial court's findings were against the manifest weight of the evidence.

¶ 48                                D. Motion to Reconsider

¶ 49    Finally, Ronald argues that the trial court erred in denying his motion to reconsider, based on his arguments under sections 8-2601 of the Code, 214(c)(3) of the Act, and 214(b)(14.5)(a) of the Act. A trial court's decision to deny a motion to reconsider is reviewed for an abuse of discretion. *Nissan Motor Acceptance Corp. v. Abbas Holding I, Inc.*, 2012 IL App (1st) 111296, ¶ 16. As we have rejected the aforementioned arguments on appeal, we necessarily determine that the trial court did not abuse its discretion in denying the motion to reconsider.

¶ 50                                III. CONCLUSION

¶ 51    For the reasons stated, we affirm the trial court's judgment.

¶ 52    Affirmed.