NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240472-U

Order filed September 2, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| MARIA AMODEO, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Petitioner-Appellee, | ) | Du Page County, Illinois, |
| | ) | |
| | ) | Appellate Court No. 3-24-0472 |
| v. | ) | Circuit No. 24-OP-886 |
| | ) | |
| RAED ALAMIRI, | ) | Honorable |
| | ) | Jeffery Scott MacKay, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Justices Anderson and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  (1) Trial court's conduct during order of protection complied with rules of judicial conduct; (2) trial court did not err in overruling respondent's objections based on hearsay; (3) trial court's grant of a one-year plenary order of protection was not against the manifest weight of the evidence; and (4) duration of emergency order of protection did not violate statutory requirements and, thus, did not render plenary order of protection void.

¶ 2     Petitioner, Maria Amodeo, filed a *pro se* petition seeking an order of protection against respondent, Raed Alamiri, alleging harassment, physical abuse, stalking, and interference with

personal liberty. The trial court granted Maria emergency relief and, following an evidentiary hearing, issued a one-year plenary order of protection. Raed appeals, and we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On June 10, 2024, Maria filed a verified *pro se* petition for an order of protection against her husband, Raed. In her petition, Maria (age 64) alleged that Raed (age 53) verbally harassed and abused her on June 9, 2024, by yelling at her and calling her names. Raed complained that she did not know how to cook or clean, calling her " 'stupid, ass hole, [and] mentally ill.' " He also told her she was " 'a bitch' " and " 'a dog and donkey'." Maria further alleged that Raed isolated her and refused to allow her to communicate with her family in Italy. Maria claimed that she lived "in fear" and felt "like a prisoner in [her] own home."

¶ 5        The petition included allegations of other incidents. Maria averred that on April 10, 2024, she was cooking in the kitchen and Raed started calling her "trash" and "garbage." When Maria told him to be respectful, Raed said that he did not care. Maria stated that Raed "got close to my face and threatened me that if I ever answer him back, that he'll break my head." Raed then bumped Maria on the shoulder, which caused her pain because she suffers from psoriatic arthritis. He took Maria's phone and keys and would not return them. Maria paced back and forth while Raed continued to yell at her and call her names. Eventually, Raed left her phone and keys on the table. He went to the bathroom, and she "grabbed [her] purse and everything and [she] left."

¶ 6        On November 17, 2023, Maria and Raed had another argument about cooking and cleaning. Maria alleged that Raed "was in my face calling me names and threatening that if I talk back, he'll break my neck." Raed forbade Maria from going out unless she asked him.

¶ 7        The final incident alleged in the petition occurred on October 21, 2023. According to Maria, Raed yelled at her and said she was " 'a bitch, loser, you donkey, asshole, idiot, ding dong."

Raed then grabbed her hand and squeezed it tightly. Maria tried to move her hand away, but Raed squeezed it harder. Maria alleged that, as she tried to pull away again, her hand slammed against the counter. Her fingers began to swell due to prior surgeries on her fingers, so Raed took Maria to the emergency room. While they waited to be seen, Raed became upset and started yelling at the medical staff, calling them "bitches." Police arrived, and Raed and Maria "had to leave [the hospital]." When they returned home, Maria wrapped her hand in ice and took some Tylenol. According to Maria's allegations, Raed's actions caused so much trauma to her hand that it "turned purple and black."

¶ 8      At the conclusion of the petition, Maria requested, among other things, that Raed be barred from threatening or committing acts of abuse against her, including: (1) harassment, (2) physical abuse, (3) stalking, and (4) interference with personal liberty. She also sought exclusive possession of the parties' residence.

¶ 9      The trial court found that Raed abused Maria and granted a 14-day emergency order of protection, with temporary exclusive possession of the residence awarded to Maria. The court then scheduled a hearing on a plenary protective order for June 24, 2024.

¶ 10      At the plenary hearing, Maria testified that she and Raed have been married for 9½ years. She stated that Raed monitors everything she does, particularly when she leaves the house. The only time she is allowed to leave unattended is when she has a doctor's appointment, and even then, Raed calls her multiple times to verify her location. Maria testified that Raed raises his voice on a regular basis and that, when he yells at her, he "comes close to [her] face" and threatens her.

¶ 11      Regarding the April 10, 2024, incident, Maria testified that Raed yelled at her and she threatened to call the police. At that point, Raed took her phone and her car keys away from her. Maria described Raed as 6-feet, 2-inches tall, and weighed 250 pounds, and stated that she is only

3

5-feet, 3-inches tall, and weighed 129 pounds. She stated that, given his size, she fell backwards when Raed bumped her with his shoulder. Raed told her that he would "break [her] head" if she did anything. Eventually, he placed her phone and keys on the table. When he went to the bathroom, she grabbed them and left.

¶ 12 She further testified that during the incident in October 2023, Raed grabbed her hand and squeezed it so hard that it hurt. As they drove to the hospital for treatment, Raed instructed her to say that she injured herself and that she hit her hand against "something" in the kitchen. At the hospital, they waited for more than three hours to be seen, and Raed became upset. He started yelling at the medical staff and calling them derogatory names. Security and police officers arrived because Raed was getting aggressive, and they asked Raed to leave. As Maria described the incident further, the following discussion occurred:

¶ 13 "Q. What was he saying to them?

A. It was very aggressive. Saying bad words. He even called her a bitch or something.

MR. ALAMIRI: Objection, your Honor.

THE COURT: What's your objection?

MR. ALAMIRI: This is a hospital, a third party. It's irrelevant to what she stated on the papers here. So what she stated on the papers much of what she is saying is irrelevant.

THE COURT: I disagree I find it relevant. It's also a statement you made. So the objection is overruled."

¶ 14 Maria further testified that Raed's acts of abuse aggravated her medical condition and affected her ability to sleep:

"Q: How has this affected you other than the ways that you just described?

A: Oh, gosh, because I'm diabetic and I have psoriatic arthritis and I have high blood pressure, you know, it doesn't help my sugar level. It's always extremely high. I see a specialist every three months[,] I have to go in for injections every month, and it's always because of the aggravation that my sugar level will not go down because of all of this aggravation. I've just had enough with him.

Q: Does this ever affect your ability to sleep?

A: Absolutely. Yes. Big time. I can't sleep well. I haven't been sleeping well. He's mentally been abusing me in every which way."

"MR. ALAMIRI: Objection, your Honor.

COURT: Go ahead.

MR. ALAMIRI: One of these statements wasn't here and her statement and the emergency order of protection. None of them were not there.

THE COURT: You can cross her on that information. I'm supposed to consider the effects that your alleged physical abuse or harassment had on her. So your objection is overruled, but you can cross her on that information if you'd like.

MR. ALAMIRI: Of course. Thank you."

¶ 15      During Raed's cross-examination of Maria, she testified that Raed calls her constantly when she is not with him as a means of monitoring her. Raed then asked why Maria did not contact the police during the incidents of abuse alleged in the petition. Maria responded that she did not contact the authorities because she was afraid of Raed. Raed then concluded his cross-examination by asking if Maria had any medical evidence to support her claim that she could not sleep. Maria

5

responded: "Yes, I cannot sleep. I don't sleep. I was sleeping on the couch because I can't stand you. I am afraid of you."

¶ 16　　Raed then presented his case-in-chief by narrating the events set forth in Maria's petition and claiming most of the allegations of abuse were false and that Maria had a "long history of false allegations." He directed the court's attention to two previous orders of protection that were dismissed and a 2016 domestic violence case, in which police arrested Maria and charged her with attacking Raed. The trial court acknowledged the prior cases and stated that it would take judicial notice of them. He claimed that the couple had a domestic dispute, and Maria called the police. Officers later arrested Maria for domestic violence against Raed. The trial judge then noted that the domestic violence case was previously before him and that he dismissed the case due to Raed's failure to appear as a witness.

¶ 17　　Raed further testified that Maria's physical condition imposes limitations on her daily activities, and that, as a result, he is Maria's primary caregiver and provides for her daily needs. He maintained that he and Maria have "the best of the best in life," and he did not understand why she filed an order of protection petition against him. The court then asked Raed for clarification as to why Maria cannot cook or clean. Raed responded by telling the court that Maria is physically incapable of cooking or cleaning because she has psoriatic arthritis.

¶ 18　　Raed claimed that the October 2023 incident evolved out of an episode of jealousy on Maria's part. The couple had an argument because Maria thought Raed was in a relationship with another woman, and Maria hit him, causing her finger to swell. Raed testified that he became upset with the nurse in the waiting room that evening because "she answered [him] with attitude." He acknowledged that he was asked to leave the hospital by two security guards.

6

¶ 19        On cross-examination, Raed denied that he squeezed Maria's hand and caused it to turn black and blue in October 2023, but he acknowledged that Maria's hand is sensitive and swells easily. He further admitted that he calls Maria frequently when he is at work to check on her. Maria's attorney then directed Raed's attention to phone records that Raed attached to his written response to Maria's petition, which were admitted as evidence at the hearing. Raed acknowledged that, according to those records, he called Maria on the morning of June 10, 2024, on his way to work and had a conversation with her that lasted 37 minutes. He then called her more than a dozen times later that morning, the same day Maria filed her petition with the court. Raed also admitted that he made several calls to Maria during his lunch break and in the afternoon.

¶ 20        Maria was called again in rebuttal and asked about the 2016 domestic violence incident. She testified as follows:

> "Q. And you heard him telling his son to tell the police that he saw you hit him?
>
> A. Right. Yes.
>
> Q. Now, he also claims that the …
>
> MR. ALAMIRI: Objection, your Honor.
>
> THE COURT: What's your objection?
>
> MR. ALAMIRI: There are so many privacy [issues] for my son.
>
> THE COURT: Your objection is overruled. She's talking about a statement you made. Go ahead."

¶ 21        In its oral ruling, the trial court found that Maria testified credibly regarding the incidents of verbal harassment on June 9, 2024, and physical abuse in April and October 2023. The court concluded that "she has shown by a preponderance abusive and harassing conduct" and entered a

7

one-year plenary order of protection, ordering Raed to refrain from any harmful or offensive contact. The court also considered Maria's request for possession of the family residence and declined to extend the emergency order granting her exclusive possession.

¶ 22     In the written order of protection, the court found that Raed abused Maria, his actions would likely cause irreparable harm or continued abuse unless they were prohibited, and the order of protection was necessary to protect Maria. The form order, which included a number of checked boxes, further provided that Raed was prohibited from committing or threatening acts of abuse, specifically: (1) harassment, (2) physical abuse, (3) stalking, (4) willful deprivation, and (5) interference with personal liberty against Maria. The court also checked the box on the form which provided:

> "Civil Cases: In granting the remedies in this Order, the Court has considered all relevant factors, including: the nature, severity, pattern, and consequences of Respondent's past abuse, neglect, or exploitation of Petitioner *** and the likelihood of danger of future abuse, neglect, or exploitation to Petitioner ***."

Raed now appeals.

¶ 23                              II. ANALYSIS

¶ 24     Initially, we note that Raed's brief lacks a concise and logical analysis of the issues he purports to raise on appeal. We have condensed Raed's arguments into four issues that can be readily ascertained and understood and will discuss each in turn. See *Twardowski v. Holiday Hospitality Franchising, Inc.*, 321 Ill. App. 3d 509, 511 (2001) (reviewing court will consider the issues raised in *pro se* appellant's brief as long as the court can "readily ascertain and understand" the issues the appellant purports to raise).

¶ 25                      A. Partiality of the Trial Court

¶ 26    First, Raed argues that he was deprived of a fair and equal opportunity to present his case and challenges the impartiality of the court. Raed claims that the court's frequent interruptions and numerous rulings against him during the evidentiary hearing show a clear bias that should not be tolerated, citing Illinois Code of Judicial Conduct Rule 2.3 (eff. Jan. 1, 2023). He further maintains that interruptions by both the court and counsel deprived the court of hearing his "full testimony" in violation of "Illinois Supreme Court Rule 611."

¶ 27    Rule 2.3 of the Illinois Code of Judicial Conduct of 2023 requires judges to perform their duties of the judicial office "without bias or prejudice" and dictates that judges "shall not *** by words or conduct manifest bias or prejudice or engage in harassment ***." Ill. Code Jud. Conduct (2023), Canon 2, R. 2.3 (eff. Jan. 1, 2023). Derisive and sarcastic comments made by the court that do not reflect fairness, dignity, or courtesy fail to uphold the ethical canons of judicial conduct. See *People v. Jones*, 2016 IL App (1st) 141008, ¶ 38 (judge's sarcastic comments, instructing the jury to disregard counsel's reference to defendant as "criminals" by saying to "disregard the comments about cold, hard criminals, please. Go ahead," and derisive remarks, implying that defendants' alleged concern for their children was disingenuous, did not comport with the standards of judicial conduct). "A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002).

¶ 28    Here, Raed claims that the court's continuous interruptions and biased comments demonstrate prejudice. We disagree. Our review of the record indicates that the trial court interrupted the proceedings only when necessary to rule on the parties' objections, addressed Raed respectfully, and exercised compassion and understanding throughout the proceedings. For

example, during Raed's testimony regarding a previous altercation between the parties, the following discussion occurred:

"THE COURT: Can I ask you a question?

MR. ALAMIRI: Yes, Sir.

THE COURT: Do you have a question? I'm sorry. I take that back. I apologize. You're right. I'm sorry. Go ahead. Keep going.

MR. ALAMIRI: I get interrupted by the Court and by the attorney. I'm not…

THE COURT: You are correct procedurally. I was misinformed. Go ahead. Keep going, sir.

MR. ALIMIRI: So the police was waiting in the house and my son, my biological son, was present in the house.

MR. MOSKOVIC [MARIA'S ATTORNEY]: Judge, I have to object. He's testifying now. This is closing argument.

THE COURT: No. It's not. It's his case.

MR. MOSKOVIC: I'm sorry. This is his case in chief. Okay.

THE COURT: Go ahead."

This example highlights one of several discussions during the plenary hearing in which the court conducted itself in an unbiased, professional, and respectful manner. After a thorough review of the transcript of the proceedings, we find no evidence of judicial bias or prejudice and accordingly reject Raed's argument.

¶ 29    As to Raed's claim that the trial court's interruptions and counsel's comments violated Illinois Supreme Court Rule 611 (eff. Feb. 6, 2013)), we reject this argument as well. First, his claim is based on a bare citation to Rule 611 that is undeveloped and conclusory. Second, and more

10

importantly, his argument cites Illinois Rule of Evidence 611 (eff. Oct. 15, 2015) (discussing mode and order of interrogation and presentation of witnesses) and federal circuit court cases that have no relevance here. It is a deep-rooted principle that a litigant appearing in this court *pro se* must follow the same rules as a litigant represented by counsel. *In re Marriage of Winters*, 160 Ill. App. 3d 277, 281 (1987) (citing *Biggs v. Spader*, 411 Ill. 42, 44 (1951)). In this case, Raed's failure to provide a coherent argument and any relevant authority to support his claim constitutes a violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), which requires an appellant's argument to contain "the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Arguments without citation to relevant authority are forfeited, and we need not consider them. *United Legal Foundation v. Pappas*, 2011 IL App (1st) 093470, ¶ 15. We therefore decline to consider this argument.

¶ 30                                    B. Admission of Hearsay

¶ 31        Raed also contends that the court erred in admitting Maria's hearsay testimony. His argument focuses on two specific instances where the court overruled his objection to such testimony: (1) the court's admission of Maria's statement regarding Raed's comments at the hospital in October 2023, and (2) the court decision to allow Maria's rebuttal testimony describing a statement Raed made to his son during the 2016 domestic violence dispute.

¶ 32        "Hearsay" is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Such statements are excluded from evidence primarily because there is no opportunity to cross-examine the declarant. *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004).

¶ 33        In considering Raed's hearsay argument, we find several rules of evidence applicable. First, Illinois Rule of Evidence 602 (eff. Jan. 1, 2011) provides that a witness may testify to matters

within their personal knowledge and that "evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." Second, a statement offered against a party that is the party's own statement is not hearsay. Ill. R. Evid. 801(d)(2)(A) (eff. Oct. 15, 2015) ("A statement is not hearsay if *** [t]he statement is offered against a party and is *** the party's own statement[.]"). Finally, a statement offered for some reason other than to prove the truth of the matter asserted is generally admissible because it is not considered hearsay under Rule 801(c). Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *Total Staffing Solutions, Inc. v. Staffing, Inc.*, 2023 IL App (1st) 220533, ¶ 49. This court applies an abuse-of-discretion standard when reviewing a trial court's decision regarding the admission of evidence. *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 20. An abuse of discretion occurs only if the trial court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view it adopted. *Id.*

¶ 34       In this case, Maria testified that Raed made both statements in her presence. She stated on direct examination and in rebuttal that she had personal knowledge of the conversations defendant had with the medical staff and his son. Thus, Maria's testimony complied with Rule 602 in that it related to events that were within her personal knowledge.

¶ 35       Moreover, Maria's testimony that Raed called hospital staff names in 2023 and that he told his son to lie to officers in 2016 was not inadmissible hearsay. First, the statements offered against Raed were Raed's own statements and, therefore, not hearsay. See Ill. R. Evid. 801(d)(2)(A) (statement offered against a party that is the party's own statement is not hearsay). Second, Maria's testimony regarding statements made by Raed was not hearsay to the extent it was not offered to prove the truth of the matter asserted. See *Total Staffing Solutions, Inc.*, 2023 IL App (1st) 220533, ¶ 50 (statements offered to show what occurred before the company transferred its business did not constitute hearsay because they were not offered to prove the truth of the matter asserted).

12

Raed was not an unavailable declarant, and Maria's testimony demonstrated why hospital staff called security and why police officers reported that she was the aggressor during the 2016 domestic violence dispute. The trial court afforded Raed the opportunity to present his case-in-chief and cross-examine Maria regarding both statements. Accordingly, we cannot say the court abused its discretion in admitting Maria's testimony.

¶ 36                                C. Finding of Abuse

¶ 37        Next, Raed claims that the trial court's finding of abuse following the plenary hearing was against the manifest weight of the evidence. In particular, he challenges the court's finding that Maria was credible and argues that she was required to support her claims of abuse with physical evidence, such as a police report or medical records.

¶ 38        To obtain an order of protection under the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2022)), the petitioner must prove abuse by a preponderance of the evidence. *Sanchez v. Torres*, 2016 IL App (1st) 151189, ¶ 19 (citing *Best v. Best*, 223 Ill. 2d 342, 348 (2006)). "Abuse" is broadly defined under section 103(1) of the Act to include physical abuse, harassment, interference with personal liberty, or willful deprivation. 750 ILCS 60/103(1) (West 2022). The Act further provides that "physical abuse" includes "(i) knowing or reckless use of physical force, confinement or restraint; (ii) knowing, repeated and unnecessary sleep deprivation; or (iii) knowing or reckless conduct which creates an immediate risk of physical harm." *Id.* § 103(14). "Harassment" is defined as "conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). The Act requires the trial court to issue an order of protection upon a finding of abuse. See *id.* § 214(a).

¶ 39    A trial court's finding of abuse will not be disturbed on appeal unless the finding is against the manifest weight of the evidence. *Sanchez*, 2016 IL App (1st) 151189, ¶ 20. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence. *Best*, 223 Ill. 2d at 350.

¶ 40    Here, the evidence showed that Raed recklessly used physical force by grabbing Maria's hand in October 2023, knowing that her hand was prone to injury and swelling. Maria testified that Raed squeezed her hand so tightly that when she attempted to pull away, she slammed her hand against the counter, causing it to turn black and blue. Her testimony was consistent with her verified statement in the petition for an order of protection and supported by Raed's testimony that Maria's hand bruised easily due to prior surgeries. Moreover, the evidence demonstrated that Raed threatened physical force on more than one occasion, telling Maria he would "break [her] head" if she disobeyed him. Maria testified that Raed threatened physical harm on multiple occasions, a contention Raed failed to challenge. Further, the evidence showed that Raed constantly called Maria derogatory names and chastised her for being unable to cook and clean even though he knew she suffered from a medical condition—namely, psoriatic arthritis—that prevented her from completed those tasks. Finally, the evidence demonstrated that Raed's conduct caused Maria to feel anxious and distressed. Maria testified that Raed called her multiple times a day to monitor her movements. She further testified that she feared for her life and was unable to sleep due to Raed's oppressive, demeaning, and unnecessary behavior. Under these circumstances, the court concluded that Raed's conduct was not necessary to accomplish a reasonable purpose and, instead, caused Maria emotional distress. That conclusion was neither unreasonable nor arbitrary, and we do not find that the opposite conclusion was clearly evident.

14

¶ 41 Raed contends that the trial court erred in determining that Maria's testimony was credible. He maintains that her testimony was, in fact, untruthful, and that she failed to support her claims with any "additional evidence." Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). Consequently, we will not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *Id.* at 499. Here, Maria testified before the trial court in a manner consistent with her petition, and Raed failed to present evidence to discredit her claims. The trial court observed both witnesses, weighed their testimony, drew the appropriate inferences, and found Maria to be more credible than Raed. There is no basis for us to disturb the court's credibility finding.

¶ 42 We further dismiss Raed's argument that Maria needed proof of physical abuse from a police report or medical records. Verbal and emotional abuse are sufficient to support a finding of physical abuse under section 103(14) of the Act. See *In re Marriage of Langhans*, 2021 IL App (2d) 200613-U, ¶ 42 (petitioner's testimony that there had been "throwing, breaking, slamming, very loud slamming" by respondent and that respondent slammed a car door in anger and said he did not "give a s**t" whether the bystanders called police allowed the trier of fact to determine that respondent's conduct demonstrated a "reckless use of physical force"). Here, Raed's threat of physical force and his constant verbal abuse of Maria provided ample evidence of harassment and physical abuse as defined in section 103 of the Act. Accordingly, we conclude that the trial court's finding of abuse was not against the manifest weight of evidence. See 750 ILCS 60/103(7), (14) (West 2022); see also *Best*, 223 Ill. 2d at 349-50 (holding that finding of abuse need only be

supported by a preponderance of the evidence and such finding will be reversed only if it is against the manifest weight of the evidence).

¶ 43                    D. Duration of Emergency Order of Protection

¶ 44        Raed also claims the plenary order of protection entered on June 24, 2024, is void because it was grounded on an emergency order of protection that lasted more than 21 days in violation of section 220 (a)(1) of the Act. We disagree.

¶ 45        Section 220(a)(1) of the Act provides that "[e]mergency orders issued under Section 217 shall be effective for not less than 14 nor more than 21 days[.]" 750 ILCS 60/220(a)(1) (West 2022). The record demonstrates that the trial court issued an emergency order of protection on June 10, 2024, and scheduled a plenary hearing for 14 days. The court subsequently entered a one-year plenary order of protection on June 24, 2025—two weeks after issuing the emergency order of protection. Because the plenary order of protection was issued within the 14-to-21-day window required by statute, section 220(a)(1) provides no basis for declaring the judgment void.

¶ 46                             E. Remaining Argument

¶ 47        Last, Raed argues that the order of protection should be vacated outright because the trial court committed an error of law under "Illinois Supreme Court Rule 60" in ruling that it had considered the relevant factors under section 214(c) of the Act. In support of his argument, Raed refers to "Federal Rule of Civil Procedure 60(b)(1)" and cites federal caselaw as authority, neither of which apply to order-of-protection proceedings in Illinois. See 750 ILCS 60/205(a) (West 2022) (any proceedings to obtain an order of protection "shall be governed by the rules of civil procedure of this State").

¶ 48        As previously discussed, Rule 341(h)(7) states that an appellant's argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the

16

pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Accordingly, this court is entitled to have the issue clearly defined with a cohesive argument presented and pertinent citations to legal authority. *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). Here, we find that Raed's failure to support his argument, with citation to relevant legal authority or a coherent argument, forfeits review on appeal of his contention that the trial court's oral pronouncement of its findings under section 214(c) demonstrated an error as a matter of law. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 49                              III. MOOTNESS

¶ 50        Before concluding, we note that this appeal was rendered moot when the plenary order of protection expired on June 24, 2025. See *Landmann v. Landmann*, 2019 IL App (5th) 180137, ¶ 11 (expiration of a plenary order of protection rendered respondent's appeal moot). While reviewing courts generally avoid deciding moot issues, we will review a moot question if it falls within one of the recognized exceptions to the mootness doctrine. *In re Carolyn J.S.*, 2024 IL App (3d) 220249, ¶ 19. One of those exceptions is the capable-of-repetition exception. *Id.* Under the capable-of-repetition exception, a court may review a moot issue when (1) "the challenged action [is] of a duration too short to be fully litigated prior to its cessation[,]" and (2) "there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." (Internal quotation marks omitted.) *In re Alfred H.H.*, 233 Ill. 2d 345, 358 (2009). Given the short duration of this plenary order of protection, it is likely, as this case demonstrates, that the issues could not be fully litigated before the order expired. Moreover, there is a reasonable expectation, based on the prior order of protection petitions Maria has filed, that similar allegations would be asserted against Raed and the same issues would arise. We find it desirable to offer guidance as to the trial court's duties and responsibility during the hearing, as well as the court's

17

application of the Act's requirements. As such, we conclude the capable-of-repetition exception applies to Raed's contentions on appeal.

¶ 51                                      IV. CONCLUSION

¶ 52          The judgment of the circuit court of Du Page County is affirmed.

¶ 53          Affirmed.